UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANTHONY P-B,                         )
                                     )
              Plaintiff,             )
                                     )
       v.                            )       No.  4:21 CV 835 JMB
                                     )
                                     )
KILO KIJAKAZI,                       )
Commissioner of Social               )
Social Security Administration,      )
                                     )
              Defendant.             )

**MEMORANDUM AND ORDER**

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, et

seq. ("the Act").  The Act authorizes judicial review of the final decision of the Social Security

Administration denying Plaintiff Anthony P-B.'s ("Plaintiff") applications for child disability

benefits and supplemental security income under Titles II and XVI of the Social Security Act,  see

42 U.S.C. §§ 401 et seq., 1381-1385.  All matters are pending before the undersigned United States

Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial

evidence supports the Commissioner's decision, and therefore it is affirmed.  See 42 U.S.C. §

405(g).

I.     **Procedural History**

On September 9, 2019, Plaintiff filed applications for child disability benefits and

supplemental security income, arguing that his disability began on April 1, 2016, as a result of

post-traumatic stress disorder ("PTSD"), paranoia, pain, drop foot,[1] severe nerve damage, gunshot

---

[1] By definition, foot drop is a neurological condition that makes it difficult for a person to lift his
foot off the ground.  See Mayo Foundation for Medical Education and Research, Foot Drop, at
http://www.mayoclinic.com/health/foot-drop/DSO1031.  Symptoms of foot drop include

wounds, unbalanced walking, and running/standing/sitting issues.  (Tr. 118, 193-213, 225)  After
Plaintiff's claims were denied upon initial consideration, he requested a hearing before an ALJ.
On August 26, 2020, Plaintiff appeared at a telephone hearing (with counsel), and testified
concerning the nature of his disability and his functional limitations.  (Tr. 28-55)  The ALJ also
heard testimony from Vocational Expert Susan Shea ("VE").   (Tr. 55-62, 298-99)   After
considering Plaintiff's testimony and the VE's testimony, and after reviewing the other relevant
evidence of record, the ALJ issued a decision on November 4, 2020, finding that Plaintiff was not
disabled, and therefore denying benefits.  (Tr. 12-23)

Plaintiff sought review of the ALJ's decision before the Appeals Council.  (Tr. 1-4)  On
May 10, 2021, the Appeals Council denied review of Plaintiff's claims, making the November 4,
2020, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted
his administrative remedies, and his appeal is properly before this Court.  See 42 U.S.C. § 405(g).

As explained below, the Court has considered the entire record in this matter.  Because the
decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.    Medical Records

The administrative record before this Court includes medical records concerning Plaintiff's
health treatment from April 1, 2016, through July 21, 2020.  The Court has considered the entire
record.  The following is a summary of pertinent portions of the medical records relevant to the
matters at issue in this case.

### A.    St. Louis University Hospital (Tr. 302-32, 390-417)

On April 1, 2016, Plaintiff presented in the emergency room at St. Louis University

---

difficulty lifting the front part of the foot; dragging the foot on the floor when walking; slapping
your foot down on the floor with each step; raiding the thigh when walking as if you were
climbing stairs; and pain, weakness, or numbness in the foot.  Id.

Hospital with six gunshot wounds, two in his bilateral inner thighs, two in his left buttock, one in his right buttock, and one in his lower back. Dr. Jennifer La Plante admitted Plaintiff to the hospital for treatment and performed an explorative laparotomy with bowel resection. Dr. LaPlante recommended Plaintiff have a nerve conduction study and a possible surgical correction to remove bullets from his buttocks.

On April 9, 2016, Dr. Carl Freeman discharged Plaintiff with the diagnoses of gunshot wounds, trauma, small bowel resection, acute blood loss anemia, weakness of his left lower extremity, retained bullets, enlarged lymph nodes, and sciatic nerve injury, with his condition being stable. During follow-up treatment on April 12, 2016, Plaintiff reported having good pain control and improved left leg strength and motor control when wearing a foot drop splint. On June 11, 2016, Plaintiff reported the AFO brace had helped his left foot mobility and improved his left foot strength.

During treatment on November 18, 2018, musculoskeletal examination showed Plaintiff had a normal range of motion.

**B.** **Affinia Healthcare** (Tr. 333-89)

From April 1, 2016, to June 18, 2019, various doctors at Affinia Healthcare treated Plaintiff's foot drop and knee pain.

Plaintiff returned for post-hospitalization treatment of gunshot wounds on April 18, 2016, and reported controlling his pain adequately. Plaintiff reported that a SLU trauma surgeon treats his trauma to his bowel and sciatic nerve damage. On June 7, 2016, Plaintiff complained of sharp leg and abdominal pain. Dr. Lisa Armbruster referred Plaintiff to a counselor and encouraged him to exercise. On July 21, 2016, Plaintiff reported having lumbar radiculopathy with severe constant symptoms and permanent left foot drop. Dr. Armbruster opined that Plaintiff's nerve damage is causing his back pain and his trauma surgeon no longer needed to treat Plaintiff for his current

3

symptoms.  Dr. Armbruster provided leg strengthening exercises and prescribed a medication regimen including 800 mg ibuprofen tablets.  Plaintiff returned on August 22, 2016, for a prescription refill and back pain treatment and reported that, although his symptoms were chronic, they were fairly controlled.  Plaintiff indicated that he had not been treated by a pain specialist or a physical therapist.  Plaintiff reported improved left foot mobility and strength with use of an AFO brace  Dr. Armbruster explained that once Plaintiff had Medicaid, she would order a new ankle foot orthosis and physical therapy.  Dr. Armbruster contacted Louis Appelman, a counselor, about scheduling a counseling session and prescribed an antidepressant to help Plaintiff's anxiety and depression.  On August 30, 2016, Counselor Appelman noted Plaintiff had acute PTSD and panic attacks.

Plaintiff reported continued low back pain at a moderate/severe level on September 22, 2016.  Dr. Armbruster diagnosed Plaintiff with depression and radiculopathy, lowered his Lyrica dosage, continued his ibuprofen prescription, and encouraged Plaintiff to exercise.

On January 19, 2017, Plaintiff reported going to school and being able to ambulate fairly well.  Dr. Armbruster opined that she would try to schedule a pain management consultation and physical therapy now that Plaintiff had Medicaid.  Examination showed normal lower extremity strength except for Plaintiff's left foot drop.  Dr. Armbruster indicated that she would get a new ankle foot orthosis.  Dr. Armbruster provided instructions on stretches for Plaintiff to do two to three times each day and proper posture for sitting and lifting.

In follow-up treatment on February 6, 2018, Plaintiff requested paperwork, outlining his limitations for his parole officer.  Plaintiff explained that he attends HVAC school and is able to tolerate sitting for forty minutes followed by ten minutes of standing/stretching, to stand for thirty minutes, and to walk for fifteen minutes.  Plaintiff noted some improvement since his last visit.

4

Examination showed normal strength of his lower extremity except for left foot drop.  Dr. Catherine Moore encouraged Plaintiff come to the office more often, not only when he needed a letter.  On June 18, 2019, Dr. Moore encouraged Plaintiff to exercise and to complete therapy.

      **C.**     **<u>Center for Interventional Pain Management</u>** (Tr. 483-516, 557-774)

From March 7, 2017, to July 21, 2020, Drs. Paul Catanzaro, Mark Belcher, and Padda Gurpreet treated Plaintiff's low back and leg pain after other conservative treatment failed.

On March 7, 2017, Plaintiff reported his pain started on April 1, 2016, and medications helped alleviate his pain.  Dr. Gurpreet's diagnoses included cervical, thoracic, and lumbosacral spondylosis.  Dr. Gurpreet administered an intraarticular injection of Plaintiff's facet joints with Plaintiff experiencing immediate reduction of his symptoms.  An MRI showed reconstructed anterior cruciate ligament, post-surgical changes, and small knee joint effusion.  On July 5, 2017, Dr. Gurpreet administered an intraarticular injection of Plaintiff's facet joints with Plaintiff experiencing immediate reduction of his pain.

On August 14, 2017, Plaintiff reported having persistent and increasing low back pain.  Dr. Belcher administered a selective nerve root injection.  Plaintiff reported almost complete resolution of his radicular symptoms within fifteen seconds of the procedure.  In follow-up treatment on August 28 and September 11, 2017, Plaintiff reported no improvement of his pain.  After Dr. Belcher administered a selective nerve root injection, Plaintiff experienced nearly complete resolution of his radicular symptoms.

On September 28 and October 12, 2017, Plaintiff reported having low back pain with tenderness. Dr. Belcher diagnosed Plaintiff with sacroiliac joint pain and administered a sacroiliac joint injection.  Plaintiff reported an eighty to ninety percent reduction in his joint pain with improvement of his gait, reduction in his compression pain, and improvement in his side-to-side

mobility.  Dr. Belcher also provided a prescription for physical therapy for back strengthening exercises and gait training.

On July 1 and 15, 2019, Dr. Belcher administered an intraarticular injection of Plaintiff's facet joints.  An MRI showed normal alignment of Plaintiff's lumbar spine and diffuse disc protrusion.  Plaintiff reported experiencing immediate reduction of his pain with normal ranges of motion.

On August 12 and 26, 2019, Plaintiff reported having persistent and increasing low back pain.  Dr. Belcher administered a selective nerve root injection with Plaintiff experiencing almost complete resolution of his radicular symptoms within fifteen seconds of the procedure.

On October 22, 2019, Plaintiff reported a seventy percent improvement of his pain after the last injection.  Dr. Catanzaro administered a selective nerve root injection.  Plaintiff experienced nearly complete resolution of his pain.  On November 15, 2019, Dr. Cantanzaro prescribed Narco.  Dr. Cantanzaro's examination on November 19, 2019, showed reproducible pain to palpation, and he observed Plaintiff's severe antalgic gait.  After administering a sacroiliac joint injection, Plaintiff reported  a nearly eighty to ninety percent reduction in joint symptomology with improvement in his gait and side-to-side mobility, and reduction in his compression pain.  Dr. Cantanzaro provided a prescription for physical therapy for back strengthening exercises and gait training.  On December 3, 2019, Plaintiff reported a fifty percent pain reduction for two weeks after the last injection.  Dr. Cantanzaro administered a sacroiliac joint injection.  On December 17 and 31, 2019, Dr. Cantanzaro prescribed Norco.

On January 14 and February 4, 2020, Dr. Cantanzaro performed a percutaneous lumbar caudal ESI, and  prescribed Narco.  Plaintiff reported improvement with his pain.  On February 18 and March 3, 2020, Dr. Cantanzaro administered an intraarticular injection of his facet joints, and

prescribed Narco.  Plaintiff reported immediate reduction of his symptomology with a normal range of motion.  On March 17, 2020, Dr. Cantanzaro administered a selective root injection and prescribed Norco.  Plaintiff reported experiencing nearly complete resolution of his radicular symptoms within fifteen seconds.

On March 31, April 14 and 28, May 12 and 26, June 9 and 23,  July 7 and 21, 2020, Dr. Cantanzaro prescribed Norco 10 mg-325 mg tablets four times a day as needed.

In a blank and unsigned Physical Residual Functional Capacity Questionnaire, there is the following notation:  "Per our conversation – this form requires an  office visit & pre-payment of $1,600.00 for completion."  (Tr. 771)

**D.** **Christian Hospital NE NW Emergency Room** (Tr. 521-36)

On January 14, 2020, Plaintiff presented in the emergency room for treatment of low back pain after being injured in a car accident.  Plaintiff reported regularly using prescription pain medication for non-medical reasons and having no history of falling with a zero fall risk score.

**III.** **Medical Opinion Evidence and Function Reports** (Tr. 226, 270-77, 771-74)

**A.** **Function Reports**

In a Function Report - Adult, Plaintiff reported his daily activities include dressing, sitting around the house, playing games, and watching television.  Plaintiff reported being able to clean his room, wash his clothes, and complete other light duties.

In a Function Report Adult – Third Party, Plaintiff's mother reported that Plaintiff watches television and plays games all day without any help.  His mother also indicated that Plaintiff could follow written and spoken instructions well.

**B.** **Medical Opinion Evidence**

**1.** **Consultive Psychiatry Evaluation – Dr. Aqeeb Ahmad** (Tr. 517-20)

7

On December 26, 2019, Dr. Aqeeb Ahmad completed a psychiatric examination.  Plaintiff reported completing high school and having a diploma in heating and cooling.  Plaintiff explained that his side job includes cleaning air conditioning or heating units.  His daily activities include playing video games, going out with his girlfriend, washing his clothes, doing some household chores, and attending church weekly.  Plaintiff reported that he has difficulty being around people because of fear caused by his PTSD and paranoia after being shot.  Plaintiff reported difficulty walking, but no other symptoms.  Plaintiff explained that a psychiatrist treated him for a few months in 2017, but he stopped treatment due to transportation issues.  Plaintiff reported smoking two to three blunts (a cigar that has had the tobacco removed and replaced with marijuana) a day.

Dr. Ahmad's mental status examination showed Plaintiff's mood to be moderately anxious and depressed, and Plaintiff was oriented to time, place, and situation.  Dr. Ahmad opined that after Plaintiff was shot several times, he "developed multiple symptoms of anxiety, withdrawal, fear of being attacked again, nightmares, and mild-to-moderate pain."  Based on his examination, Dr. Ahmad opined that PTSD, gunshot wounds to both legs, back, and upper extremity, and left foot drop were the diagnoses to be considered.  Dr. Ahmad found that Plaintiff's ability to understand, remember, and apply information appeared to be adequate; his ability to interact with others is somewhat decreased as he had difficulty trusting people; and Plaintiff is moderately impaired in concentration, persistence, and pace due to his physical limitations and fear for his life.

2. **Consultive Psychological/Disability Evaluation – Dr. Laura Tishey** (Tr. 537-39)

On April 23, 2019, Dr. Laura Tishey completed a psychological/disability evaluation. Plaintiff presented claiming to be disabled due to PTSD and depression.  Plaintiff provided his Missouri driver's license as proof of ID.  Plaintiff reported receiving outpatient psychiatric services

in 2017, but he stopped seeing the psychiatrist due to lack of insurance.  After being shot, Plaintiff reported having nightmares and intrusive thoughts about the incident, and feeling nervous and anxious most of the time.

Plaintiff explained that his ability to walk was impaired by the nerve damage in his left foot and his drop foot.  Plaintiff reported his daily activities include performing hygiene tasks, chores, and grocery shopping, but he does not drive independently, and he is able to take public transportation.

Dr. Tishey noted that it appeared Plaintiff was able to get along with peers and authority figures, but he had difficulty trusting others since being shot.  Dr. Tishey opined that Plaintiff displayed signs of mild depression and PTSD and concluded that Plaintiff had "a mental disability which prevents him from engaging in that employment or gainful activity for which his age, training, experience or education will fit him."  (Tr. 539)

## IV.    The Hearing Before the ALJ

The ALJ conducted a telephone hearing on August 26, 2020.  Plaintiff participated in the telephone hearing with an attorney and testified at the hearing.  The VE also testified at the telephone hearing.

### A.    Plaintiff's Testimony

Plaintiff testified that he lives with his mother and little sister.  (Tr. 38)  Plaintiff explained that he can drive, and he completed high school.  (Id. at 39)

Plaintiff testified that he last worked part time in 2015.  The ALJ noted that Plaintiff does not have any past relevant work.  (Id. at 40)

Plaintiff testified that he has foot drop, causing difficulty walking and going up and down stairs.  (Id. at 41)  Plaintiff experiences constant tingling and burning sensation in his left foot.  (Id.

at 43)  Plaintiff testified that the bullet lodged in his pelvis makes sitting longer than five minutes

uncomfortable.  When sitting, Plaintiff testified that he has to change positions every five minutes.

(Id. at 44)  Plaintiff testified that he can only stand or walk for ten minutes, and he cannot lift more

than ten pounds.  (Id. at 41, 44, 52)  Plaintiff explained he needs to take a five minute break after

standing.  (Id. at 47)  Plaintiff indicated that he experiences foot and back pain.  (Id. at 50)  Plaintiff

indicated that he experiences side effects from his medications.

Plaintiff testified that during the day, he helps around the house and take care of his

girlfriend's six-year old son.  (Id. at 45)

In response to the ALJ's query, Plaintiff testified that he is able to watch television for

twenty-five to thirty minutes.  (Id. at 52)

**B.     The VE's Testimony**

The VE noted that Plaintiff did not have any past relevant work.  (Id. at 40, 55)

The ALJ asked the VE a series of hypothetical questions to determine whether someone

Plaintiff's age, at least a high school education, and specific functional limitations would be able

to perform a sedentary exertional level job.  First, the ALJ asked the VE to assume a hypothetical

individual who cannot climb ladders, ropes, or scaffolds; can occasionally balance on narrow,

slippery, or erratically moving surfaces; can occasionally stoop or crouch but never kneel or crawl,

never use hazardous machinery, foot controls with left lower extremity, or operate motor vehicles

as part of a work function; no exposure to unprotected heights or extreme vibrations; able to

remember, understand, and carry out simple and routine instructions and tasks; cannot have strict

production quotas with an emphasis on a per shift rather than a per hour basis; limited to only

simple work-related decisions with few, if any workplace changes; no interaction with the general

public; and only occasional interaction with coworkers and supervisors.  (Id. at 55-56)  The VE

responded that such hypothetical person would be to perform work such as a hand assembler, a sedentary machine tender, and a table worker, all sedentary jobs.  (Id. at 56)

The ALJ then asked the VE to assume an individual with the same limitations as the first hypothetical but the individual can never climb ladders, ramps, and stairs.  The VE responded that such individual could not perform any competitive work.  (Id. at 57)  Next, the ALJ asked the VE to assume an individual with the same limitations as the first hypothetical, but the individual while seated would require the ability to shift from side to side staying on task when shifting, and the opportunity to stand and stretch after thirty minutes of sitting staying on task while standing and stretching.  The VE responded that such hypothetical person would be able to perform the jobs she listed in the first hypothetical.  (Id. at 58)  Finally, the ALJ asked the VE to assume the first hypothetical, but the individual would be able to stand or walk for five minutes at a time and stand and walk for a total of two hours out of an eight-hour workday.  The VE responded that such individual would not be able to perform competitive work.

The ALJ also asked about the amount of time a person could be off task.  The VE explained that an employee cannot be off task fifteen percent of the workday.  (Id. at 59)  The VE further explained that if the individual would have two or more unexcused or unscheduled absences each month, the individual could not perform competitive work.

Counsel asked if the individual in the first hypothetical would need a sit/stand option every thirty minutes with the need to walk for five minutes and be off task, could the individual perform competitive work.  The VE responded no.  (Id. at 60)

## V.    The ALJ's Decision

In a decision dated November 4, 2020,  the ALJ  determined that  Plaintiff was not disabled under the Social Security Act.  (Tr. 12-23)

The ALJ determined that Plaintiff had severe impairments of six gunshot wounds with residual left radiculopathy and left foot drop, degenerative disc disease, sacroiliitis, peripheral neuropathy, obesity, major depressive disorder, anxiety disorder, and PTSD.. (Id. at 14)  The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform a reduced range of sedentary work with the following modifications:  (1) he can never climb ladders, ropes, or scaffolds, kneel or crawl, but he can occasionally climb ramps and stairs, balance on narrow, slippery, or erratically moving surfaces, stoop, and crouch; (2) he should avoid all exposure to unshielded moving mechanical parts, unprotected heights, and extreme vibrations with no use of hazardous machinery; (3) he cannot use foot controls with the left lower extremity, and he cannot drive a motor vehicle as part of his work function; (4) he can understand, remember, and carry out simple and routine instructions and tasks consistent with SVP level 1 and 2 jobs with no strict production quotas with an emphasis on e per-shift rather than per-hour basis; (5) he can make simple work-related decisions, and few, if any workplace changes; and (6) he can have no public interaction with occasional coworker and supervisor interaction.  (Id. at 16-20)

The ALJ found that Plaintiff does not have any past relevant work.  (Id. at 21)  The ALJ found, based on Plaintiff's age, education, and residual functional capacity ant the VE's testimony, that Plaintiff could perform the demands of jobs such as a hand assembler and a machine tender Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act.

The ALJ's decision is discussed in additional detail below.

## VI.    Standard of Review and Legal Framework

"To be eligible for … benefits, [Plaintiff] must prove that she is disabled …."  Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

"To receive disability benefits, [Plaintiff] must establish a physical impairment lasting at least one year that prevents her from engaging in any gainful activity."  Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's

findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The claimant's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the claimant's impairments.

6.     The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.;

see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VII.   Analysis of Issues Presented

In his brief to this Court, Plaintiff argues that the ALJ erred in evaluating his subjective pain complaints, and the RFC is not supported by some medical evidence.  In response, Defendant argues that the ALJ properly evaluated Plaintiff's pain, and the RFC is supported by substantial evidence, including some medical evidence.

### A.   Subjective Complaints

As for Plaintiff's subjective complaints, the ALJ fully considered these complaints and discounted them for the following reasons:

> [Plaintiff] reported fair to good pain control and improved left foot mobility and strength with the use of an AFO brace shortly after his hospitalization.  [Plaintiff] previously had issues with accessing pain management and physical therapy due to lack of health insurance, but after starting pain management, he typically rated his pain at 5/10-6/10 and previously reported 70% improvement with improved activities of daily living after injections, suggesting some positive response to conservative treatment.  Since his gunshot wound injuries, he has had only one emergency room visit in January 2020 for back pain, but this was for temporary injuries from a motor vehicle accident while driving.  Such evidence strongly suggests his symptoms are not as limiting or frequent as claimed.

(Tr. 18) (internal citations omitted)

A claimant's subjective complaints may be discounted if they are inconsistent with the evidence as a whole.  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007).  The Eighth Circuit requires that an ALJ consider the following factors when assessing a claimant's subjective complaints:  1) the claimant's daily activities; 2) the duration, intensity, and frequency of the pain; 3)  precipitating and aggravating factors; 4) the dosage, effectiveness, and side effects of

medication; 5) any functional restrictions; 6) the claimant's work history; and 7) the absence of objective medical evidence to support the claimant's complaints. Finch, 547 F.3d at 935 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1994)). The ALJ is in the best position to gauge subjective complaints and is granted deference in that regard as long as she explicitly discredits a claimant's subjective testimony and gives good reason for doing so. Jones v. Kijakazi, 2022 WL 888139, at *5 (E.D. Mo. Mar. 25, 2022).

Here, the ALJ provided several reasons for his finding that Plaintiff's "statements concerning the intensity, persistence, or limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 17) The ALJ cited to Plaintiff's pain management treatment and how Plaintiff rated his pain at 5/10-6/10 level and reported 70% improvement with activities of daily living after injections. The ALJ also noted that, since Plaintiff's gunshot injuries, Plaintiff has had only one emergency room visit for back pain caused by a motor vehicle accident while driving. The objective medical record shows that during treatment Plaintiff reported fair to good pain control and improved left foot mobility and strength with the use of an AFO brace, going to school and being able to ambulate fairly well. The ALJ specifically found that Plaintiff's "treatment history suggests less than disabling symptoms." (Tr. 18)

Plaintiff's daily activities can also be considered as inconsistent with his subjective complaints of a disabling impairment, and may be considered by the ALJ in judging the subjective complaints. While a plaintiff "need not prove []he is bedridden or completely helpless to be found disabled," Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted), Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment, and may be considered alongside other factors in assessing

16

the severity of his symptoms.  See Vance v. Berryhill, 860 F.3d 1114, 1121 (8th Cir. 2017) (finding "[t]he inconsistency between [the claimant's] subjective complaints and evidence regarding her activities of daily living" raised questions about the weight to give to her subjective complaints.).  Plaintiff's daily activities included performing personal care, cleaning his room and making his bed, doing laundry, taking out trash each day, lifting ten to fifteen pounds, driving, going out with his girlfriend and helping take care of her child, and sitting around the house watching television and playing games most of the day without any help.  See Estes v. Kijakazi, 2022 WL 782299, at * 6 (E.D. Mo. Mar. 15, 2022).  See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the claimant watched television, read, drove, and attended church in concluding that subjective complaints of pain were not credible).  The ALJ found these activities consistent with a sedentary exertion level work. Substantial evidence supports the ALJ's finding that Plaintiff's daily activities are inconsistent with his allegations of disabling symptoms. The undersigned finds therefore, that the ALJ properly considered Plaintiff's daily activities as another factor that weighed against Plaintiff's subjective complaints.

Further, the ALJ also considered Plaintiff's treatment was generally conservative after his initial hospitalization.  "Claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment."  Brown v. Astrue, 2012 WL 8868789, *14 (E.D. Mo. Mar. 15, 2012); see also Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (affirming claimant was not disabled, in part, because claimant's treatment was routine and conservative.).  Treatment that does not involve more aggressive treatments than appointments with therapy, and prescription medications is routine.  Rivers v. Saul, 2022 WL 1080937, at *13 (E.D. Mo. Apr. 11, 2022). Although the fact that Plaintiff did not receive inpatient treatment is not dispositive, the lack of

hospitalization supports his treatment was routine and conservative.  See Fritzke v. Colvin, 2015 WL 12781200, at *14 (D. Minn. Mar, 2, 2015); see also Wise v. Astrue, 2012 WL 3156763, at *4 (W.D. Mo. Aug. 2, 2012) (affirming the claimant's treatment, which included outpatient visits and psychiatric medications, was routine and conservative treatment for her depression and anxiety.). Plaintiff received routine and conservative treatment, including outpatient visits and medication management.  See Robinson v. Sullivan,, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).  Indeed, the ALJ found after Plaintiff's initial injury, he visited the emergency room just once for back pain stemming from a car accident. Routine or conservative treatment supports a finding that a claimant is not disabled.

The undersigned also finds inconsistencies in the record that tend to militate against Plaintiff's sworn hearing testimony.  His hearing testimony was inconsistent with what he reported as his activities of daily living and with much of the objective medical evidence.  The record shows that Plaintiff failed to report pain comparable to his allegations of disabling pain. He reported helping take care of his girlfriend's six-year old son, and his mother reported that Plaintiff watches television and plays games all day without any help.  Although Plaintiff testified that when sitting he has to change positions every five minutes, in response to the ALJ's query, Plaintiff also testified that he is able to watch television for twenty-five to thirty minutes. (Tr. 44, 52)  Further, during the forty-six minute administrative hearing, it appears Plaintiff was able to sit without changing positions every five minutes, showing that Plaintiff was able to sit for forty-six minutes without getting up and changing positions every five minutes. (Id. at 30, 61)

The undersigned finds that the ALJ considered Plaintiff's subjective complaints on the basis of the entire record before him and set out the inconsistencies on the record as a whole.

See  Pierce v. Kijakazi, 22 4th 769, 772-73 (8th Cir. 2022) (ALJ properly discounted claimant's allegations, as he considered discrepancies between pain complaints and objective examination results, and relatively conservative course of treatment).  While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole.  "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."  Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted).  Accordingly, the ALJ was justified in discounting Plaintiff's subjective complaints due to the inconsistencies between Plaintiff's sworn testimony, his daily activities, and the objective medical evidence.  See VanVickle v. Astrue, 539 F.3d 835, 828 (8th Cir. 2008) ("An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole.").

"As is true in many disability cases, there is no doubt that [Plaintiff] is experiencing pain." Perkins v. Astrue, 648 F.3d 892, 901 (8th Cir. 2011).  "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability."  Id. at 900.  As summarized above, the ALJ acknowledged that Plaintiff suffered pain and symptoms attributable to his conditions, however, Plaintiff has not demonstrated that such symptoms preclude him from performing a limited range of sedentary work.

**B.**     **RFC Determination**

Plaintiff argues that the ALJ's RFC determination is not supported by some medical evidence showing his ability to function in the workplace, and the ALJ improperly made interpretations of the medical findings.

A claimant's RFC is the most an individual can do despite the combined effects of his

credible limitations.  See 20 C.F.R. § 404.1545.  "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)).  An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment.").  The ALJ must explain his assessment of the RFC with specific references to the record.  SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion).  Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity.  20 C.F.R. §§ 404.1545(e), 416.945(e).

"It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Pearsall, 274 F.3d at 1217.  Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by substantial medical evidence that Plaintiff could perform the requirements of competitive work without having his pain result in impermissible levels of off-task behavior such as lying down and absenteeism.  See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ reviewed Plaintiff's testimony and medical records, examined the consistency of his subjective complaints with evidence of record, analyzed each of the medical opinions in the record, and determined Plaintiff's RFC.  Based on a careful review of the record,

the Court finds that the ALJ's determination that Plaintiff had the RFC to perform sedentary[2] work with several additional limitations was supported by substantial evidence, including medical evidence.  The Court also finds that the ALJ did not impermissibly make interpretations of the medical findings, and substantial evidence supports the ALJ's RFC determination.

In reaching his decision, the ALJ considered and found generally persuasive the opinions of State agency psychological reviewers who found that Plaintiff could interact with coworkers and supervisors where social interaction was not a primary job requirement and could have no intense or extensive interpersonal interaction, handling complaints, or work that requires close proximity to coworkers or the general public which were mostly consistent with the record as a whole.  The ALJ considered and found persuasive the opinion Dr. Ahmad.

Regarding his mental limitations, the ALJ observed that examination findings occasionally showed anxiety, mild to moderate depression, lability, a fair thought process, paranoia, ideas that people might hurt him, anxious psychomotor activity, anhedonia, and evidence of uncooperative behavior.  Examination findings also showed normal mental status, appropriate mood and affect, pleasant and socially appropriate demeanor, good eye contact, normal speech, no paranoia or preoccupations, intact insight and judgment, normal memory, no agitation or anhedonia, normal attention and concentration, normal thought content, and no suicidal ideation.  The ALJ also considered examination findings that Plaintiff could follow commands, spell "world" forward and

---

[2] A limitation to sedentary work is itself a significant limitation.  See, e.g., Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (explaining that sedentary work is itself a significant limitation, showing the ALJ assigned some weight to the claimant's physician's opinion).  Although state agency medical consultants determined Plaintiff could perform light work with additional restrictions, the ALJ found the objective evidence supported greater physical restrictions by formulating a physical RFC limiting Plaintiff to sedentary exertional work with additional postural limitations.

backward, perform serial three subtractions, perform serial seven subtractions slowly, calculate basic math, recite five digits forward and four backward, and recall 3/3 words after a delay. The ALJ further noted that, although Plaintiff had been referred to a counselor, he stopped seeing a psychiatrist in 2017 due to transportation issues, but once Plaintiff received Medicaid coverage in 2019, he did not seek further psychiatric treatment or medications. The ALJ also considered that Plaintiff's mental impairments did not prevent Plaintiff from being able to help care for his girlfriend's son, manage finances, go out with his girlfriend, and attend church weekly and occasional family dinners. The ALJ also found Plaintiff's ability to use public transportation independently inconsistent with his alleged inability to go out alone due to his anxiety. The ALJ next found that Plaintiff's mother's function report where she reported that Plaintiff could pay attention, finish tasks, and follow instructions well supported Plaintiff's intact ability to understand, remember, persist, concentrate, and maintain pace. The ALJ concluded that the objective medical evidence did not document the reported severity of symptoms that Plaintiff alleged.

Plaintiff specifically argues that the ALJ exceeded his authority be inferring limitations from the state agency providers' opinions. The Court recognizes that an ALJ "may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Rather than making interpretations of the state agency providers' opinions, the ALJ's conclusions were based on the objective medical findings and other relevant evidence before him to establish an RFC, without his own interpretation of the medical findings as alleged by Plaintiff. The Eighth Circuit has held, moreover, that the "interpretation of physicians' findings is a factual matter left to the ALJ's authority." Mabry v. Colvin, 815 F.3d 386, 391 (8th Cir. 2016) (citation omitted). While the ALJ did not find any medical opinion completely persuasive, it is apparent that the RFC reflects the ALJ's interpretation of such opinions along with the full record. The ALJ

22

explicitly considered Plaintiff's mental impairments in determining the RFC and consequently limited Plaintiff to understanding, remembering, and carrying out simple instructions, simple work-related decisions, and few, if any, workplace changes.  The ALJ's decision reflects that he accounted for Plaintiff's difficulty interacting with other people by limiting Plaintiff to work where he primarily works with objects rather than people; having only casual and infrequent interaction with coworkers, and only occasional interaction with supervisors during the initial training period; and limiting him to no direct interaction with public and coworker/supervisor interaction.  "Despite [Plaintiff's] dissatisfaction with how the ALJ weighed the evidence, it is not the Court's role to reweigh that evidence." Schmitt v. Kijakazi, 27 F.4th 1353, 1361 (8th Cir. 2022) (citation omitted).  As stated earlier, Plaintiff bears the burden to prove his RFC, Pearsall, 274 F.3d at 1217, and he has not shown that his medically determinable impairments and the limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.  Accordingly the Court finds that Plaintiff's argument that the ALJ improperly made interpretations of the medical findings in reaching his RFC is without merit; substantial evidence supports the ALJ's RFC determination.

Regarding his physical limitations, the ALJ articulated the clinical findings in the record without any interpretation of those clinical observations.  The record contains Plaintiff reporting during treatment, fair to good pain control and improved left foot mobility and strength with the use of an AFO brace shortly after his hospitalization, attending school, and being able to ambulate fairly well.  The ALJ found that the most recent examinations showed Plaintiff had 5/5 strength in the bilateral extremities, no acute distress, normal motor function, otherwise normal muscle bulk and tone, otherwise normal deep tendon reflexes, and normal station and posture.  The ALJ

concluded that, although the medical evidence supports some limitations, the medical evidence does not support a finding of disability.

Plaintiff once again argues that the ALJ exceeded his authority be inferring limitations from the medical evidence.  It does not appear to the Court, however, that the ALJ improperly inferred limitations from the medical evidence.  Instead, the ALJ evaluated the objective medical findings by treating doctors, along with  other objective evidence, to establish an RFC with substantial support in the record.  The ALJ explicitly considered Plaintiff's pain, decreased sensation and strength, decreased mobility, abnormal gait, and drop foot in determining the RFC and, consequently, limited Plaintiff to sedentary exertional level work with postural limitations. The ALJ also considered Plaintiff's daily activities as being consistent with sedentary exertional work.  While the ALJ did not find any medical opinion completely persuasive, it is apparent that the RFC reflects the ALJ's interpretation of such opinions along with the full record.  "Despite [Plaintiff's] dissatisfaction with how the ALJ weighed the evidence, it is not the Court's role to reweigh that evidence."  Schmitt v. Kijakazi, 27 F.4th 1353, 1361 (8th Cir. 2022) (citation omitted).   Despite Plaintiff's assertions that his pain would preclude him from working, substantial medical evidence supports the ALJ's RFC determination.

Finally, no treating or examining source ever indicated that Plaintiff was disabled or unable to work or imposed functional limitations on Plaintiff's capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2009) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find a disability a factor in discrediting subjective complaints).  Plaintiff's treating sources never placed any meaningful

restrictions on Plaintiff.  To the contrary, doctors encouraged Plaintiff to be more physically active and to exercise.  See Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2004).

Substantial evidence supports the ALJ's RFC determination, see Julin v. Colvin, 826 F.3d 1082, 1089 (8th Cir. 2016) (ALJ permissibly excluded greater limitations from RFC after finding that record was not consistent with degree of symptoms alleged by claimant); Cypress v. Colvin, 807 F.3d 948, 951 (8th Cir. 2015) (ALJ's RFC determination was supported by substantial evidence, including objective findings on examination, diagnostic imaging results, and evidence regarding claimant's treatment.).

## VIII.  **Conclusion**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.  Id. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed. Accordingly,

25

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 14th day of September, 2022.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

26